**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

JEFFREY EDWARD TITUS,

                Petitioner,

                                        Case No. 06–10770

v.

                                        JUDGE PAUL D. BORMAN

ANDREW JACKSON,                              UNITED STATES DISTRICT COURT

                Respondent.

_____/

**<u>OPINION AND ORDER
DENYING PETITION FOR WRIT OF HABEAS CORPUS</u>**

    Petitioner Jeffrey Edward Titus, a state inmate currently confined at the Kinross

Correctional Facility in Kincheloe, Michigan, through counsel, has filed a petition for a writ of

habeas corpus, pursuant to 28 U.S.C. § 2254, alleging that he is being held in violation of his

constitutional rights.[1]  Petitioner was found guilty of (1) two counts of first-degree, premeditated

murder, MICH. COMP. LAWS § 750.316, and, (2) two counts of felony firearm, MICH. COMP. LAWS

§ 750.227b, in the Kalamazoo County, Michigan, Circuit Court.  He was sentenced to life

imprisonment, without the possibility of parole, for the first-degree-murder convictions, and

the mandatory two-year term for the felony-firearm convictions.

    Petitioner raises the following two issues in his habeas petition: (1) the trial court erred in

denying his motion for directed verdict on the charge of first-degree, premeditated murder, because

the prosecution failed to prove an essential element of the crime, premeditation, and therefore

violated his due process rights, and, (2) the Court should conduct an evidentiary hearing, or remand

---

[1]When Petitioner filed his petition for writ of habeas corpus with this Court on February
21, 2006, he was incarcerated at the Mound Road Correctional Facility in Detroit, Michigan.

this case to the trial court for an evidentiary hearing, on whether defense counsel was ineffective because he failed to introduce evidence of Charles Lamp's admitted involvement in a similar murder. Respondent has filed an answer to the petition, asserting that the claims lack merit because the decision of the Michigan Court of Appeals did not result in an objectively unreasonable application of clearly established Supreme Court law.

This Court finds that there was sufficient evidence to support Petitioner's convictions for first-degree, premeditated murder. In addition, Petitioner has not established that his trial counsel was deficient. Therefore, the Court DENIES the petition.

I.      BACKGROUND

Petitioner's convictions arise from the November 17, 1990, shooting deaths of Doug Estes and Jim Bennett, in the Fulton State Game area, two days into firearm-deer season. The victims were not hunting together but were found near one another, both shot in the back, through their hunting licenses, from close range. Petitioner's property is adjacent to that area. There were no eyewitnesses to the homicides. The prosecutor presented many witnesses, who testified with respect to incriminating statements made by Petitioner, incriminating acts, and other actions undertaken by Petitioner in regard to hunters on his property. Petitioner was not charged with the alleged crimes until December 2001, after the investigation of the case was taken over by a "cold case" investigations unit.

The defense theory in this case was that Petitioner did not commit these offenses and that he had nothing to do with the shootings, as he was deer hunting with a friend on property a significant distance from his farm.

The prosecution's theory in the case was that Petitioner was  extremely territorial about his

2

property and may have been confused or inaccurate about the boundary lines between his land and the state-game area, which abutted his land, and that he shot and killed the two hunters for trespassing on his property.

The three-week trial in this case began on June 26, 2002. The first witness to testify was the stepson of decedent Doug Estes, Robert Brown, who was eighteen-years old at the time of the alleged incident. Brown testified that he, Estes, and Mark Perry went deer hunting in the state-game area on the day in question. He acknowledged that he frequently argued with his stepfather, and that, at one point in time, he had to move out of the house as a result, moving in with a friend whose name was Norberto Againeses.

Regarding the day of the homicides, Brown testified that when he, his stepfather, and Perry got to the game area, they separated. He subsequently heard some gunshots coming from the direction from where he had seen his stepfather walking, after they had separated. It was Brown's testimony that he thought that his stepfather might have shot a deer; he did not go to the area immediately to find out. Rather, he waited approximately twenty to twenty-five minutes.

Brown testified that he then walked toward the area of the gunshots, where he came upon two bodies lying on the ground near each other–his stepfather's body and that of Jim Bennett, whom he did not know. According to Brown, he previously did not see any other person, other than his stepfather, walking in that area. Brown testified that, after he discovered the bodies, he went to find Perry and then, they both ran to get help from a man who lived nearby. Brown admitted to moving the bodies after he found them. He also identified the gun that his stepfather was hunting with that day, which was later shown to him by the police.

On cross-examination, Brown admitted that his stepfather was involved in drug

3

dealing–marijuana and cocaine–and that he (his stepfather) was a user.  Brown said that he, his stepfather, and Perry smoked marijuana while they were on their way to the state-game area that day.  He also acknowledged that his mother dealt in drugs and that she had supplied them with the marijuana.  According to Brown's cross-examination testimony, subsequent to hearing the gunshots, he heard the squealing of car tires coming from a nearby road.

Mark Perry was next to testify.  It was Perry's testimony that the three men, he, Brown, and Estes, left Estes' house, somewhere around 12:30 or 1:00 p.m. that day, to go hunting in the state-game area.  According to Perry's testimony, when they got to the area, there was a sheet for hunters to sign in, but they did not do so.  Perry said that, once they were in the game area, they separated.  He testified that he did not see where either Brown or Estes went.

It was Perry's testimony that sometime later that afternoon, Brown came running through the woods, calling out for him, and yelling that Estes had been shot.  Perry said that he and Brown then went to the location where Brown said that he saw the bodies.  Perry acknowledged that they had smoked marijuana on the ride to the state-game area but denied knowing if Estes was involved in the drug business.  When cross-examined, Perry testified that back in 1990, when he gave his statement to the police, he told them that the blood on decedent Estes' face was already dry when they came upon the bodies.

Kimber Tracy, who lived with Jim Bennett, the other decedent in this case, testified that Bennett left the house around 4:30 p.m. that day, to go hunting.  According to Tracy's testimony, Bennett grew marijuana and shared that marijuana with his friends.  She further testified that she did not tell the police about Bennett's drug activity at the time of the incident, because she thought they would not treat the case seriously if they knew that he was a grower.  Tracy acknowledged that the

night after the shooting, some friends went to her trailer to remove the marijuana that was there.  She said that she did not know where Bennett was growing the marijuana.  She also testified that she did not know Estes or anyone in the Estes' family.

On cross-examination, Tracy testified that it was unusual for Bennett to go out hunting so late in the day.  She said that he normally hunted on his family's farm and did not recall him ever hunting at the state-game area.  Tracy testified that she was paid for the marijuana that was removed from the trailer.  She also admitted that Bennett had an audiotape in the trailer and that he told her, if anything ever happened to him, then she should give the tape to the police.

It was Tracy's testimony that, after Bennett was shot, she looked for the tape but it was gone.  She said she did not know who removed the tape from the trailer.  She also admitted that she did not know what was on the tape because she had never listened to it.

Jan Estes, wife of the decedent Doug Estes, testified next.  According to her testimony, Estes was involved with drugs; "[h]e [was] doing meth." (Tr. 374)  Ms. Estes also admitted to being a cocaine user herself.  It was her testimony that, initially, she did not have a good relationship with Estes.  According to her, he was not someone who would easily walk away from a confrontation.  She admitted that, at times, she was frightened of him.  Ms. Estes also admitted that she was the one who had given the men–her son, her husband, and Perry–the marijuana that they smoked on the day in question.  Ms. Estes denied knowing the other decedent, Jim Bennett.

On cross-examination, Ms. Estes agreed that she told the police that her husband and Norberto Againeses used to deal drugs together around 1990.  She said that when the police returned her husband's wallet to her, some money and other papers were missing.

Garth Snow testified next.  According to Snow's testimony, he was hunting at the state-game

area that day.  He said he arrived there around 3:00 p.m., and hunted for about three hours, at which time he headed back toward the parking lot where he had parked his car.  It was Snow's testimony that during that period, he did not see any other hunters, except for one he saw walking toward the back of the game area.  Snow testified that he subsequently heard some cries for help but because he did not think that they were distress cries, he did not think anything of them; he thought someone just needed help carrying out a deer.  According to Snow, as he was walking to the back of the game area, he came upon Brown, who told him what had happened.  Snow said that Brown appeared distressed.  Snow and Brown then walked up to the road to call for help.  Snow waited with Brown, and, when the paramedics arrived, he escorted them back to the area.  It was Snow's testimony that because it was getting dark, a flashlight was needed.

Ron Elwell, whose property abutted the state-game area, testified next.  Elwell testified that, on November 17, 1990, he was outside working on his deck, when he heard someone, whom he identified as Perry, yelling for help.  According Elwell, Perry said "that the two had been shot."  (Tr. 406).  It was Elwell's testimony that he then yelled to his wife to call 911.  He said he and Perry subsequently went back into the woods, where they waited for the paramedics to arrive.  Elwell said he was with Perry, and two of his neighbors, Clarence and Todd Jones.

On cross-examination, when questioned whether there was anything unusual that he saw at the scene of the shooting, Elwell testified that he had seen business cards strewn about–"[i]t looked like business cards–like out of somebody's wallet–were strewn all over around–around Mr. Bennett."  (Tr. 411).

Dennis Otte, a deputy sheriff with the Kalamazoo County, Michigan, Sheriff's Department, was the first officer to arrive at the scene.  Deputy Otte testified that it was his duty to secure the

scene.  According to Deputy Otte's testimony, he, along with another deputy, Deputy Russell

Richards, walked back into the woods, where they found the two bodies lying several feet apart from

each other.  It was Deputy Otte's testimony that there was a firearm lying close to Bennett's body

but the gun that Estes was supposedly carrying that day was not found at the scene.  Deputy Otte

testified that he found a wallet, with its contents strewn about the area.  It was his testimony that it

appeared that both men had been shot once in the back.  Deputy Otte further testified that temporary

lighting was brought in to light the area.  He said that he stayed at the scene until the bodies were

removed, which was at approximately 11:00 p.m. that night.

 Officer Russell Richards, also from the Kalamazoo County Sheriff's Department, testified

next.  It was his testimony that, while at the scene, he saw a truck come across the field and toward

the scene of the shooting.  When Officer Richards went to see who was in the truck, Petitioner and

another man (Stan Driskell) got out of the truck, asked him what had happened, and told him that

they were there to check the traps that were on Petitioner's property.

Officer Marty Johnson, a crime-scene investigator, testified that he was also called to the

area to secure the scene.  It was his testimony that the police remained there during the night.

According to his testimony, an initial search was conducted to find Estes' gun but it was not located.

He said that, early the next morning, the police again searched the area for Estes' gun but still none

was found.  He said the police did, however, find Bennett's gun.  According to Officer Johnson,

Bennett's gun was sent to the laboratory to be processed for latent fingerprints; "[t]wo of the

fingerprints belonged to Jim Bennett.  The third was–was not identifiable due to insufficient ridge

characteristics."  (Tr. 477-478).

Officer Johnson further testified that, subsequently, on November 19, 1990, Petitioner

7

notified the police that he had found a gun, leaning up against a tree, which apparently belonged to Estes.  Officer Johnson, along with Detective Wiersema and Petitioner, then went to the area to retrieve the gun.  Estes' gun was also tested for latent fingerprints but none was found.

It was Officer Johnson's testimony that Estes was shot with a shotgun slug, and that Bennett was shot with a round of buckshot.  When Officer Johnson was asked if he had asked Petitioner for samples of shotgun shells that he would typically use for hunting, Officer Johnson replied, "I don't recall the exact ones other than that they did not match the type of the ones that we had recovered from the bodies." (Tr. 496).  According to Officer Johnson's testimony, the toxicology tests done pursuant to the autopsies of both Estes and Bennett showed the presence of marijuana in both decedents.

The prosecution then presented several witnesses, who were Petitioner's neighbors, and, who had talked to Petitioner at some point in time regarding hunters on his property.  Patricia Burnworth, a neighbor, testified that, on the day in question, Petitioner came by her house and told her he had found two dead hunters on his land.  Burnworth stated that her husband and her daughter were present when Petitioner made that statement.  According to Burnworth's testimony, she told Petitioner he should call the police.  Burnworth said she was home that entire day and that she recalled hearing five shots, fired in two quick sequences, between 4:00 and 5:00 p.m.  It was Burnworth's testimony that it was her belief that those shots came from the area just north of Petitioner's property.  Burnworth testified that she later became aware that a car had gone into a nearby ditch but she herself did not see the car that evening.

On cross-examination, Burnworth testified that it was common during deer season for hunters to stray away from the state-game area and onto private property, like Petitioner's farm, and

8

that the private owners would have to tell the hunters that they were trespassing.  Burnworth also acknowledged that because there was a rise in the land, you could not see the location where the bodies were found from Petitioner's house.  According to Burnworth's cross-examination testimony, it was not until 8:00 or 9:00 p.m., that night, that Petitioner actually came to her house and made the statement regarding the bodies being found on the property.  She said she talked to the police the day of the incident and then did not talk to them for over ten years.

Bonnie Huffman, Burnworth's daughter, testified next.  She said she was deer hunting on her family's property on the day of the incident and was just returning home when Petitioner arrived at her mother's house.  She said she stopped hunting about 5:15 p.m., that day, because it was getting dark.  According to Huffman's testimony, she walked into the house with Petitioner and was present when Petitioner was telling her mother that he had found two dead hunters on his property.  Huffman also testified that, while she was hunting that day, she heard the sound of sirens and emergency vehicles in the area.  She also said she heard shots coming from the direction of Petitioner's farm, estimating the time to be somewhere around 3:30 to 4:30 p.m.

Huffman's testimony also consisted of the following:  She said that while she was hunting that day, she heard sounds of a car spinning its tires and, when she went to see what was happening, she saw a man trying to get his car out of the ditch.  Huffman testified that the man was acting strangely in that he had refused her offers of help in getting his car out of the ditch.  She acknowledged that the police had shown her some photographs, but she testified that she did not recognize any of the men in those photographs as the man that she had seen that day.

Huffman also testified that, shortly after Petitioner moved onto his farm, she was hunting on her parent's property near his farm.  She said she was sitting up in a tree, when Petitioner saw her.

9

According to her testimony, Petitioner told her that she was on his property and had to leave. She said she was afraid of him because he had a handgun and was waving it around while he was telling her to leave. It was Huffman's testimony that she then came down out of the tree and went home to tell her father what had happened. She said that she believed her father had handled the situation.

On cross-examination, Huffman testified that it was around 4:00 or 5:00 p.m., on the day in question, when she saw the car in the ditch. She testified that she had heard gunshots prior to hearing and seeing the car in the ditch. Huffman said that the man at the car was wearing a camouflage coat. She further acknowledged that she was afraid of that man because he was so insistent on not wanting her to help him. Additionally, according to Huffman's cross-examination testimony, she estimated that Petitioner spent about twenty minutes at her parents' home that evening.

Over defense objection, the trial court then permitted the prosecution to present additional 404(b) character witnesses, which included Richard Adams, Chris Whitby, Ted Whitby, and Dale Beaty. Adams testified that, in September 1990, prior to the instant homicides, he was bow hunting in the state-game area near Petitioner's farm, when a man carrying a shotgun came up to him and angrily told him that, because he was on private land, he would have to leave the property. According to Adams' testimony, he briefly argued with the man. He said he told the man that he was on public land and did not need to leave but nevertheless decided to leave, because the man was waving the shotgun around in what Adams believed to be a threatening manner. Adams said that he had seen that man on other occasions, driving a pick-up truck in the nearby fields. Adams identified that man in court as Petitioner.

When cross-examined, Adams acknowledged that he had previously told the police the man

who had confronted him that day was about twenty- or thirty-years old.  It was Adams' testimony that he did not immediately report the incident to the police.  He said that he spoke to the police in 1990, regarding that incident but did not speak to them again until 2001.  Adams acknowledged that he saw Petitioner's picture on television, when Petitioner was arrested in 2001, for the alleged murders of Estes and Bennett.

Chris Whitby testified that in 1991, after the instant homicides, he was hunting in the state-game area and shot a deer.  However, because the deer did not immediately die, he tracked the injured deer onto Petitioner's farm.  He said he then confronted a man, who told him he was on private property and had to leave.  According to Chris Whitby's testimony, he identified that man as Petitioner and said that he (Petitioner) was carrying a firearm with him at the time.  It was Chris Whitby's testimony that Petitioner told him he had problems with trespassers and, if he caught him on his land again, then he would call the police.  Chris Whitby was sixteen-years old at the time of that incident and was hunting with other family members, who also got involved.  When cross-examined, he acknowledged he had crossed the boundary from state land onto private property while tracking the injured deer.  He did not talk to the police about that incident until about one year after it happened.  He also recalled that a woman was with Petitioner at the time.

Ted Whitby, Chris's uncle, testified that when he came upon the confrontation between Chris and Petitioner, he saw that Petitioner (whom he identified in court) was angry and therefore, he said that he asked Chris to leave and go back to the car.  On cross-examination, he agreed that Chris was not on state land and had crossed over onto private land.

Dale Beaty testified that in 1992 or 1993, during hunting season at the state-game area, he also had a confrontation with a man.  According to Beaty's testimony, the man told him that he

11

owned the land, and then, he asked him to leave.  It was Beaty's testimony that the man said something to him about individuals having been shot in the area.  Beaty testified that when he refused to leave, the man walked away.  He said once the man was gone, he left the area and then notified the sheriff's department.  Beaty identified Petitioner, in court, as the man that confronted him in the state-game area.  On cross-examination, Beaty acknowledged that he continued to hunt in that area and that he had other confrontations with others in the woods.

The prosecution also presented testimonial evidence from a number of witnesses regarding statements allegedly made by Petitioner concerning either the homicides at issue, or his general demeanor regarding trespassers on his property.  Those witnesses worked with Petitioner when he was employed by the Veteran's Administration ("VA") as a police officer.[2]

Michael Finn testified that Petitioner told him that he found Estes' gun in the woods, took it home, cleaned it, and then called the police and told them he had found it.

John Kalikin testified that, sometime in 1992, Petitioner made a similar statement to him, adding that he (Petitioner) was very frustrated with how the police were investigating the matter and how they treated him.  He said Petitioner told him he had taken a polygraph test and had passed.  Kalikin did not report that alleged conversation to the police until 2000.

Marian Gibbs testified that Petitioner came to the sawmill, which she and her husband operated, and told her that he had found the gun, that the police were too inept to find it, and talked about how the bodies looked at the scene.  According to her testimony, she alleged that Petitioner told her that he had kicked the decedents off of his property prior to the shootings.  It was her

---

[2]According to the presentence report, Petitioner did not have a prior criminal record and he worked for the Veteran's Administration from 1977 to 1995.

testimony that she and her husband reported that conversation to the police.

On cross-examination, Ms. Gibbs testified that she had worked with Petitioner at the VA, and that she had ill feelings toward him because of the things she had heard at work. It was her testimony that she had known Petitioner to be a braggart.

Ms. Gibbs' husband, Gary, gave similar testimony regarding the statements made by Petitioner. However, it was Mr. Gibbs' testimony that he did not recall Petitioner saying anything to them about having seen the bodies.

Daniel Israels testified that Petitioner told him that he had gotten home around 4:30 p.m., on the day in question, and heard the gunshots.

Gary Bryant testified that he heard Petitioner say he found the gun and took it home with him. It was also Bryant's testimony that he heard Petitioner say that hunters were trespassing on his property and shooting "his" deer. (Tr. 710). Bryant further testified that he knew Petitioner was an avid hunter and that he had been in the military. Bryant did not report those alleged statements to the police.

Michelle Smock testified that Petitioner told her that he found hunters on his property and that he later found "the" gun. It was her testimony that he said that the decedents "deserved it" because they were trespassing. (Tr. 719). According to Smock's testimony, that conversation took place sometime in 1992 or 1993. She also testified that she had problems at work with Petitioner and that she had testified against him at an employment hearing. Smock did not report the alleged comments to the police until 2000. She also admitted that Petitioner was a braggart and exaggerated a lot.

Irene Gruell testified that Petitioner told her that he found the gun and took it home before

13

calling the police and that he would patrol his property to make sure that there were no trespassers on his land.

Lloyd Denney testified that Petitioner told him that he had found the gun and that someone from Athens, Michigan, had called him to tell him the location of the gun. It was Denny's testimony that Petitioner did not tell him who had called him or how that person knew the location of the gun. Denny acknowledged that Petitioner's comments were made openly at work, in front of others, and that Petitioner had expressed to him that he did not have anything to do with the shootings.

Amy Branham testified that Petitioner told her there were two hunters found dead on his property and that the police considered him a suspect. According to her testimony, Petitioner made those statements with a laugh, and said that the police could not prove that he had committed the crimes; Petitioner told Branham that other people had discovered the bodies. It was Branham's testimony that she did not report those alleged conversations to the police until June 2000. Branham also acknowledged that she had problems with Petitioner at work and that she had testified against him at a disciplinary hearing.

Donna Hutchins testified that within a few weeks of the shootings, Petitioner told her that he would have no qualms about shooting someone who was trespassing on his property. According to Hutchins' testimony, she also alleged that Petitioner told her that the dead hunters were on his property and that they deserved to die. It was her testimony that she then said to Petitioner "you did this," to which he replied "probably." (Tr. 754).

On cross-examination, Hutchins acknowledged that, in her experience, Petitioner was a braggart and would exaggerate things and make provocative statements, just to get reactions from others. She also admitted she did not contact the police regarding those alleged statements until she

was contacted by them in 2000.

Jeanne Edwards testified that Petitioner referred to the decedents as "poachers" and that he found the gun after the police had already conducted their search. (Tr. 762-764). Edwards acknowledged that Petitioner never talked to her about the men trespassing on his property. She did not report Petitioner's alleged comments to the police.

Paul Norris, chief of the VA police department, testified that Petitioner told him he came home on the evening of the murders and saw lights in the land next to his farm. According to Norris' testimony, Petitioner told him that when he went to investigate the situation, he was met by the police, who told him that two men had been killed.

Marcia Alcock testified that, on one occasion, Petitioner told her if he ever caught a poacher, then he would "skin them alive and pour salt on their bodies." (Tr. 774). Alcock said that the comment was made generally and not specifically in regard to trespassers on Petitioner's land. It was Alcock's testimony that the alleged statement was made in or around 1994, and that she did not take any action in response.

Guy Cherry also testified that, on one occasion, Petitioner told him if he had trouble with people coming onto his property, then he would have no problem "blowing them away," if one of those trespassers gave him a problem. (Tr. 781). According to Cherry's testimony, Petitioner told him if that happened, then he would just tell the police that the trespasser was the first one who pulled a gun on him. It was Cherry's testimony that the conversation with Petitioner took place sometime in the fall of 1991, and that he did not report the conversation to the authorities until he saw an article in the paper regarding Petitioner's arrest. On cross-examination, Cherry acknowledged that, at the time, Petitioner may have been expressing his irritation over trespassers,

15

and that he did not admit to having shot anyone.

During the prosecution's case-in-chief and out of the presence of the jury, Petitioner's counsel informed the trial court that he had been contacted by a prison inmate, Junior Fred Blackston, who told him that a man named Charles Dean Lamp had confessed to him (Blackston) about killing Estes and Bennett. According to Petitioner's counsel, Blackston also told him that Lamp had gotten stuck in a ditch on the day in question. Petitioner's counsel added that he had a polygraph test administered to Blackston and that he had passed.

Petitioner's counsel said that he then sent an investigator to interview Lamp. He told the trial court that Lamp was willing to talk to the defense about the situation. Furthermore, Petitioner's counsel told the trial court that Lamp was administered two polygraphs, one of which was inconclusive, and the other which he passed. Lamp denied that he had confessed the homicides to Blackston.

Following, Sergeant Michael Werkema, from the "cold case" unit, testified that he took over the investigation of the case in or around 2001. According to Sergeant Werkema's testimony, he questioned Petitioner, pursuant to an investigative subpoena. It was Sergeant Werkema's testimony that Petitioner discussed with him the firearms that he possessed in 1990. Sergeant Werkema testified that when he asked Petitioner about his whereabouts on November 17, 1990, Petitioner told him he had been deer hunting with Stan Driskell at two different farms near Battle Creek, Michigan, that he had shot a deer around 5:45 p.m. that day, that he and Driskell separated to hunt during the afternoon, that they left the farm, with the deer, around 6:00 p.m., that they stopped briefly to eat on the way home, and that when they arrived back at Petitioner's house, around 7:00 p.m., they saw lights on the land behind Petitioner's property and drove over to find out what was happening.

16

According to Sergeant Werkema's testimony, Petitioner told him he had taken photographs of the shotgun he found but that he did not share those photographs with the police. Sergeant Werkema also testified that Petitioner denied having received a phone call from anyone, specifically from a man named Jack Warren, telling him the location of the gun in the woods, and denied telling anyone he had received such a call. It was Sergeant Werkema's testimony that, when questioned, Petitioner denied making any of the statements attributed to him by the various witnesses, and, specifically, denied telling anyone that he had "probably" committed the offenses. (Tr. 816). Sergeant Werkema further testified that Petitioner told him that he had an active trapping business, and that he usually checked his traps first thing in the morning and would also check them, at times, late in the afternoon.

On cross-examination, Sergeant Werkema testified that the police never found any evidence that Estes and Bennett knew each other or that they were involved in each other's drug business. Sergeant Werkema acknowledged that Petitioner denied that he shot either man.

Detective Ronald Petroski testified that the distance from Petitioner's farm to the farm where Petitioner said he was hunting on the day of the shootings was about twenty-seven miles. Detective Petroski said it would take approximately thirty-five minutes to drive that route.

The final witness for the prosecution was Jack Warren, who denied that he ever called Petitioner. When cross-examined, Warren acknowledged that Petitioner had told him he had been accused of taking the gun home and cleaning it. The prosecution then rested.

Following, defense counsel motioned the trial court for a directed verdict, arguing that the evidence presented during the trial was insufficient to prove the necessary element of premeditation for the first-degree-murder charge. The trial court denied the motion.

17

The defense then presented its first witness: Stanley Driskell, who had a Ph.D. in economics and lived in Ann Arbor, Michigan.  Driskell testified that he had been hunting with Petitioner since 1981.  He said they frequently hunted on the Crandall and Shephard farms, near Battle Creek.  He said the owners of those farms were Petitioner's friends.

Driskell then testified as to their "normal" hunting routine.  He said that he and Petitioner would leave early in the morning, go to their perspective hunting area, separate to different stands, meet up again at lunchtime, eat, and then go back to hunting.  Driskell said that they usually hunted between the hours of 4:00 and 5:40 p.m., when the deer were active and there was still daylight.  It was Driskell's testimony that Petitioner was an avid hunter; he said that he never knew him to break off a hunt early.

When Driskell was questioned about their routine on November 17, 1990, he testified to the following.  He said he was with Petitioner on that day, hunting at either the Crandall or Shephard farm.  Driskell said they walked the area together until about 4:00 p.m., when they then split up to go to their respective blinds.  According to his testimony, they met up again, around 6:00 p.m. Driskell testified that it was then that he learned that Petitioner shot a deer but had not yet field-dressed it.  He testified that he helped Petitioner put the deer into Petitioner's truck, and then, they drove back to Petitioner's farm.

Driskell further testified that, when they arrived back at Petitioner's farm, they drove to a shed, which Petitioner used to dress out deer.  While there, they noticed lights in the woods behind Petitioner's property.  Driskell said that when they drove back to check on those lights, a police officer came up to them and told them it was a crime scene and that they could not go to the scene. Driskell said the officer took their names and afterward they returned to Petitioner's house.

18

According to Driskell's testimony, Petitioner's demeanor was normal when they met up at 6:00 p.m. It was his testimony that he did not believe that Petitioner left the farm where they were hunting prior to 6:00 p.m., because it would have taken him thirty to forty minutes to drive from the farm to his property. Driskell acknowledged that Petitioner had always been a braggart. He also testified that he had cooperated with the police and even offered to allow the police to tape record his phone conversations with Petitioner.

On cross-examination, Driskell testified that when he hunted with Petitioner it was not uncommon for them to be apart and out of each other's sight, usually from 4:00 p.m. to 6:00 p.m. He also agreed that it was uncommon not to field-dress a deer where it was shot. It was Driskell's testimony that Petitioner told him that Jack Warren told him (Petitioner) that someone found the gun and took it home.

Larry Crandall, the owner of the farm where Petitioner frequently hunted, testified next. He said that he had known Petitioner since 1966, when Petitioner was a young boy working on his farm. Crandall testified that his farm and the Shephard farm were in close proximity to each other. It was his testimony that he was aware that Petitioner and Driskell often hunted together.

According to Crandall's testimony, he said that he remembered Petitioner and Driskell hunting on his farm on the day in question. He said that when Petitioner hunted on his farm, he usually parked his truck near the farm buildings. Crandall said that he was first interviewed by the police in 2000. He also testified that Petitioner told him he had found the gun.

When questioned on cross-examination whether Petitioner ever told him that trespassers should be shot or that a property owner has the right to shoot trespassers, Crandall denied Petitioner ever making those statements to him.

19

Paul Frederick, another one of Petitioner's long-time friends, testified regarding his history of hunting with Petitioner, the types of guns and ammunition that Petitioner used when hunting, his knowledge of Petitioner's property, and the farms where Petitioner would hunt.  When questioned whether Petitioner ever told him that he would shoot anyone who trespassed on his property, Frederick denied that Petitioner ever made such a statement to him.  Frederick also testified to the fact that it was not unusual to wait to dress-out a deer, especially if the deer was shot late in the day and the lighting in the field was poor.

Howard Swabash, a retired Michigan State Police Detective Lieutenant retained by the defense as an investigator, testified regarding police-investigative techniques.  Swabash testified that when the defense received information indicating that Charles Lamp may have been the man seen with the car in the ditch on that day, he obtained a photograph of Lamp, as well as photographs of other men who resembled Lamp and showed those photographs to Helen Nofz, the woman who witnessed the man with the car in the ditch on the day of the shootings.

Helen Nofz, who lived near Petitioner and across the street from the state-game area, testified next.  According to Nofz's testimony, she received a call from a neighbor that day telling her that there was a car in the road-side ditch near her home.  Nofz testified that she then went to see if she could help the driver.  When she got there, it was obvious to her that the man wanted someone to help him pull his car out of the ditch but Nofz said that when she offered to call the police to get him a tow, the man became very agitated.  It was Nofz's testimony that the man was acting very nervous and upset and specifically asked her not to call the police.  Nofz said when she subsequently heard about the homicides, she called the police, thinking that the incident with the man might be related.

Nofz further testified that she described the man she saw as wearing a camouflage hunting

20

jacket and possibly a cap; she described the car as having a hatchback and a large rear window. Following, the police contacted her and requested a composite drawing of the man for them. The police also asked her to look at photographs of different types of cars.

According to Nofz's testimony, she was later contacted by Swabash and shown a display of photographs. Nofz testified that she picked out Lamp's photograph from that display as looking quite a bit like the man she saw that day. She said she was contacted by the police in 2000 and was asked if she had ever been threatened by Petitioner, to which she responded no.

On cross-examination, Nofz testified that the man with the car in the ditch told her that he ran into the ditch to avoid hitting some deer in the road. She acknowledged she could not positively identify Lamp as the man in the ditch after twelve years.

Petitioner's wife, Julie Titus, testified next. According to Ms. Titus' testimony, she said she remembered an incident where some hunters had come onto their property and that she and her husband had gone out to tell them that they were on private property and had to leave. It was her testimony that Petitioner did not make any threatening statements to those hunters.

When questioned regarding the events on November 17, 1990, Ms. Titus testified as follows. She said that Petitioner and Driskell left the house around 5:00 a.m., to go hunting. According to Ms. Titus' testimony, she left the house that day sometime that afternoon and returned home between 6:00 or 6:30 p.m. She said that when she arrived home, she noticed the lights in the woods behind their property but did not go out to investigate the situation. It was her testimony that Petitioner and Driskell returned home around forty-five to sixty minutes later. She said she told them about the lights in the woods and that subsequently, they left to check on the situation. Ms. Titus said that Petitioner and Driskell came back to the house later and told her what the police had

21

told them.  She said that later that night a reporter for the local newspaper came to the house to ask them about the situation.  According to Ms. Titus, Petitioner called her at work the next Monday and told her he had found the gun in the woods.  She said that he told her that he had called the police to come and recover it.

The final witness for the defense was Norberto Againeses.  According to Againeses' testimony, he knew Brown and Estes.  He admitted that in 1990, he was heavily involved in dealing marijuana and that he knew Estes was a user and dealer of drugs.  He said that, at one point in time, Brown came to live with him because he was having trouble with his stepfather, Estes.  It was Againeses' testimony that he heard Brown make some generally threatening comments toward Estes.  He also admitted to knowing Wertz and Bennett.

Further testimony from Againeses revealed that, at one point, Brown and Estes asked him if he could sell a large quantity of marijuana, providing they could get their hands on it.  Againeses admitted that they brought up the idea of stealing the marijuana from where it was growing in the game area.  Againeses testified that he had assumed the marijuana, which they proposed stealing, was from the Bennett operation.

According to Againeses' testimony, on the morning of November 17, 1990, Brown came to his house and asked him to go hunting with him and Estes.  He admitted he was aware of a plan to use hunting as a cover for the proposed theft of the marijuana.

On cross-examination, Againeses testified that he did not recall ever seeing Brown and Bennett together.  He denied being part of a plan to steal marijuana and denied hearing Brown directly state his plan.  Againeses acknowledged that, in 1995, he found out that Brown had an affair with his wife, while Brown was living at his house, which ultimately caused his divorce.

The prosecution then presented rebuttal witnesses.  Patricia Lamp, the mother of Charles Lamp, testified that the composite drawing done, according to Nofz, did not look like her son, that he never deer hunted, and that in 1990, he was driving a Mustang.  She denied ever hearing the names of Norberto Againeses, Doug Estes, or Jim Bennett.  On cross-examination, she denied her son was involved in the drug business.

Darlene McPike, Charles Lamp's ex-wife, testified that she never knew him to hunt but did know that he owned some firearms and said he was driving a Mustang in 1990.  She also testified that she had never heard the names of the decedents or Againeses.  It was her testimony that Charles Lamp did smoke marijuana with friends but denied he was involved in selling drugs. On cross-examination, she acknowledges she was divorced from Lamp in 1990 and did not know of his activities during that time period.

The prosecution called Brown to testify again as a rebuttal witness.  Brown denied that he was involved in any plan with Estes or Wertz to steal marijuana from Bennett.  He also denied knowing that marijuana was growing in the state-game area.  He said he neither saw nor met Bennett, nor heard his name, prior to finding the bodies in the state-game area on November 17, 1990.  Brown did acknowledge having an affair with Againeses' wife and admitted that his relationship with him had deteriorated since then.

Wertz, Jan Estes' brother, testified next.  He said that he used marijuana and sold drugs in the past, in order to pay for his own use.  He denied knowing Bennett prior to his murder, denied discussing stealing marijuana from Bennett with Brown or Estes, and denied making plans to steal marijuana that was growing in the state-game area.  Wertz also denied knowing Againeses.  He said that he was in the Upper Peninsula, hunting, on November 17, 1990.

23

The final rebuttal witness was Jan Estes.  She denied telling her brother that Brown had gone to live with Againeses because he and Estes were arguing.

After approximately two-and-one-half days of deliberations, the jury found Petitioner guilty of two counts of first-degree, premeditated murder.

Petitioner, through counsel, timely filed his appeal as of right from his convictions and sentences in the Michigan Court of Appeals.  Along with his appeal of right, Petitioner also filed a motion to remand, seeking an evidentiary hearing on an ineffective assistance of counsel claim.  In his appeal as of right, Petitioner raised the following claims:

> I.     The trial court reversibly erred in denying the defense motion for a directed verdict on the charge of first-degree, premeditated murder, where the prosecution failed to present legally sufficient evidence on the essential element of premeditation.
>
> II.    The trial court reversibly erred in denying the defense motion to bar the prosecution from presenting evidence of [Petitioner's] alleged other acts under MRE 404(B).

On June 16, 2003, the Michigan Court of Appeals denied Petitioner's motion to remand, stating that it was "not persuaded that a remand is necessary at this time."  *People v. Titus*, No. 243642 (Mich. App. Ct. June 16, 2003).

On February 19, 2004, the Michigan Court of Appeals affirmed Petitioner's convictions and sentences.  *People v. Titus*, No. 243642, 2004 WL 316427 (Mich. App. Ct. Feb. 19, 2004).  Petitioner then filed a timely motion for rehearing in the Michigan Court of Appeals, arguing that the state appellate court should rehear the matter in order to rule on Petitioner's request for a remand for an evidentiary hearing.  The court of appeals denied the motion for rehearing.  *People v. Titus*, No. 243642 (Mich. App. Ct. June 16, 2003).

Petitioner subsequently filed an application for leave to appeal in the Michigan Supreme

24

Court, raising the same issues as raised in the Michigan Court of Appeals. The Michigan Supreme Court denied his application on November 22, 2004. *People v. Titus*, 471 Mich. 920, 688 N.W.2d 831 (2004).

Petitioner did not file a petition for a writ of certiorari in the United States Supreme Court, nor did he file a motion for relief from judgment pursuant to sub-chapter 6.500 of the Michigan Court Rules. Petitioner's petition is timely in that it was filed less than one-year following the date on which Petitioner's convictions became final by virtue of the expiration of the period for him to file a petition for a writ of certiorari in the United States Supreme Court–ninety days (90). 28 U.S.C. § 2244(d)(1)(A). No previous petitions have been filed in this or any other federal district court by Petitioner.

Petitioner filed the pending petition for writ of habeas corpus on February 21, 2006, challenging his convictions on the same grounds as raised in both state appellate courts.

## II.   ANALYSIS

### A.   Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this Court's habeas corpus review of state-court decisions. Under the AEDPA, a federal court's review of a habeas proceeding is limited. A federal court may not grant a writ of habeas corpus unless the state adjudication on the merits either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted a decision that was based upon an unreasonable determination of the facts in the light of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Supreme Court clarified this standard in *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000):

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

**B.      Insufficiency of the Evidence Claim**

Petitioner claims that there was insufficient evidence to establish that he committed the first-degree, premeditated murders of Estes and Bennett. Specifically, Petitioner contends that the prosecution failed to present legally sufficient evidence on the essential element of premeditation and therefore the trial court erred in denying his motion for a directed verdict, thus violating his due process rights.

A federal habeas court has no power to grant habeas relief on the ground that a state conviction is against the great weight of the evidence. *Young v. Kemp*, 760 F.2d 1097, 1105 (11 th Cir.1985). A claim that a verdict went against the great weight of the evidence is not of constitutional dimension, for habeas corpus purposes, unless the record is so devoid of evidentiary support that a due process issue is raised. *Griggs v. State of Kansas*, 814 F. Supp. 60, 62 (D. Kan.1993). The test for habeas relief is not whether the verdict was against the great weight of the evidence, but whether there was any evidence to support it. *United States ex. rel. Victor v. Yeager*, 330 F. Supp. 802, 806 (D.N.J.1971). The standard for evaluating a motion for a directed verdict is identical to the standard for determining whether to grant judgment notwithstanding the verdict.

26

FED. R. CIV. P. 50(b).

Despite the general prohibition against federal habeas corpus review of issues of state law, *see Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (to the extent a petitioner's argument is based upon state law, the petitioner has failed to state a claim upon which habeas corpus relief may be granted), a claim that the evidence was insufficient to convict a petitioner is cognizable under 28 U.S.C. § 2254. Because the Due Process Clause "forbids a State to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt," *Fiore v. White*, 531 U.S. 225, 228-229 (2001), "a state law question regarding the elements of the crime predicates the enforcement of [Petitioner's] federal constitutional right." *Richey v. Mitchell*, 395 F.3d 660, 672 (6th Cir. 2005).

The Due Process Clause of the Fourteenth Amendment protects an accused in a criminal case against conviction except upon proof beyond a reasonable doubt. *In re Winship*, 397 U.S. 358 (1970). The issue before this Court is whether sufficient evidence was presented to the jury from which a reasonable factfinder could find that the essential elements of the crime were proven beyond a reasonable doubt.

In resolving this issue, however, this Court is bound by two layers of deference to groups who may otherwise view the facts differently than the Court. *See Saxton v. Sheets*, 547 F.3d 597, 602 (6th Cir. 2008). First, as with all sufficiency-of-the-evidence-challenges, this Court must determine whether when "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In making this determination, the court does not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute its judgment for that of the trier of fact. *See United States*

27

*v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993).   Therefore, even though the Court "might have not

voted to convict a defendant had [it] participated in jury deliberations, [it] must uphold the jury

verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes

in favor of the prosecution." *Brown v. Kontech*, Nos. 06-4037/4043, slip op. at 13 (6th Cir. filed

June 2, 2009).

Second, if the Court finds that the evidence was insufficient to convict under *Jackson*, the

Court must apply a second layer of AEDPA deference and determine whether the state appellate

court was "objectively reasonable" in concluding that a rational trier of fact could have found

Petitioner guilty beyond a reasonable doubt. *Saxton*, 547 F.3d at 602.  "The question 'is not whether

a federal court believes the state court's determination . . . was incorrect but whether that

determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 129

S. Ct. 1411, 1420 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2005)).

### 1.    Elements Beyond a Reasonable Doubt

The habeas court must review all of the evidence in the record and determine whether a

reasonable jury could have found guilt beyond a reasonable doubt.  "The evidence must afford a

substantial basis from which a fact in issue can reasonably be inferred." *Spalla v. Foltz*, 615 F.Supp.

224, 227 (E.D.Mich. 1985) (citing *Brown v. Davis*, 752 F.2d 1142, 1145 (6th Cir.1985)).  As the

*Spalla* court noted: "The prosecution need not negate every reasonable theory consistent with

innocence." *Id*. (citing *Jackson v. Virginia*, 443 U.S. 307 (1979); *Holland v. United States*, 348 U.S.

121 (1954)).  In fact, "[a] conviction may be sustained based upon nothing more than circumstantial

evidence." *Saxton v. Sheets*, 547 F.3d 597, 606 (6th Cir. 2008) (citing *United States v. Kelley*, 461

F.3d 817, 825 (6th Cir. 2006) ("Circumstantial evidence alone is sufficient to sustain a conviction

and such evidence need not remove every reasonable hypothesis except that of guilt.")).

Here, Petitioner challenges the sufficiency of the evidence to support his first-degree-premeditated-murder convictions, specifically arguing that the prosecution failed to prove beyond a reasonable doubt the element of premeditation. This Court must reject his challenge if, considering the evidence in the light most favorable to the prosecution, it concludes that a rational fact finder could have found that the elements of the crime were proven beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. In making this judgment, this Court must bear in mind that the beyond-a-reasonable-doubt standard, itself mandated by the Due Process Clause, requires the factfinder "to reach a subjective state of near certitude of the guilt of the accused [and] symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself." *Id.* at 315.

This Court recognizes that the very existence of the *Jackson* test presupposes that juries accurately charged on the elements of a crime and on the strict burden of persuasion to which they must hold the prosecution, nevertheless may occasionally convict, even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt. This Court assumes that judges may do so as well. The test was adopted to provide an additional safeguard against that possibility.

The question before this Court in the instant case is whether the evidence, taken together and viewed in the light most favorable to the prosecution, could allow any rational trier of fact to conclude beyond a reasonable doubt that Petitioner committed the elements of first-degree murder, specifically premeditation. *Warren v. Smith*, 161 F.3d 358, 360 (6th Cir.1998). In conducting such an inquiry this Court considers all the evidence presented in the record.

Because a claim of insufficiency of the evidence presents a mixed question of law and fact, this Court must determine whether the state court's application of the *Jackson* standard was

29

reasonable. *Johnson v. Hofbauer*, 159 F.Supp.2d 582, 596 (E.D. Mich. 2001). Moreover, the *Jackson* standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324.

Under Michigan law, the elements of first-degree murder are that the actor have an actual intent to kill, and that the intent must have been the result of premeditation and deliberation, rather than from a split-second, impulsive decision. *People v. Dykhouse*, 418 Mich. 488, 495 (1984). In other words, first-degree, premeditated murder, the form of first-degree murder charged in this case, requires a finding that Petitioner committed a homicide with premeditation and deliberation. *See People v. Morrin*, 31 Mich.App. 301, 328 (1971). "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *Id.* at 329. Under Michigan law, while the minimum time required to premeditate "is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a 'second look.'" *People v. Vail*, 393 Mich. 460, 469 (1975). "[A]n opportunity for a 'second look' may be merely seconds, minutes, or hours, dependant on the totality of the circumstances surrounding the killing." *Johnson v. Hofbauer*, 159 F.Supp.2d at 596 (citing *People v. Berthiaume*, 59 Mich.App. 451, 456 (1975)). "One cannot instantaneously premeditate a murder" in Michigan, and although premeditation and deliberation can be inferred from the circumstances of the homicide, they cannot be the product of speculation. *People v. Plummer*, 229 Mich.App. 293, 301, 305 (1998). As the district court noted in *Hofbauer*:

> The elements of premeditation and deliberation may be inferred from the circumstances surrounding the killing. Premeditation may be established through evidence of the following factors:
> 1. the prior relationship of the parties;
>
> 2. the defendant's actions before the killing;

30

3. the circumstances of the killing itself;

4. the defendant's conduct after the homicide.

159 F. Supp. 2d at 596 (quoting *People v. Anderson*, 209 Mich. App. 527, 537 (1995)).

After a thorough review of the record, the Court finds that the trial court properly denied Petitioner's motion for directed verdict because the elements of premeditation and deliberation were sufficiently established.   The homicides appeared to have been carried out execution style: the victims' wounds were both in the middle of their back and the gunshots were at close range and targeted within the victims' hunter's license tags.   (Tr. 794).   The prosecution submitted several witnesses, who testified that Petitioner was extremely territorial, keeping a close guard of his property boundaries and the wild game that lived there.   In fact, while armed, Petitioner had confronted several other hunters both before and after the homicides in question. (Tr. 561, 586, 630, 762).

Petitioner's statements before and after the homicides also support a finding of premeditation.

Witness testimony detailing statements that Petitioner made about the circumstances surrounding the homicides are telling.[3]   Pat Burnsworth testified that Petitioner told her that he had found the victims on his property but had not called the police.  (Tr. 510, 512).   According to Marian Gibbs, he told her that he had kicked the hunters off his property.  (Tr. 657-659).   David Israels testified

---

[3] Several witnesses also testified about Petitioner's knowledge of the suspected murder weapon, which Petitioner found in the woods near the subject homicides.  Michael Finn testified that Petitioner told him that he found the gun, kept it a couple days, cleaned it, and then turned it over.  (Tr. 641, 646).   Gary Bryant, Michelle Smock, and Gruell testified essentially the same. (Tr. 690, 719, 725).   When Detectives Werkeman and Brown interviewed Petitioner, Petitioner claimed that he never touched the gun, never cleaned it, and never told the others that he had done that.  (Tr. 827).

31

that Petitioner told him that he was at home at the time of the murders and heard the shots.  (Tr. 699-700).

Petitioner also told Michelle Smock that he found the dead hunters on his property and that "they deserved it for being on his property 'cause they were trespassing." (Tr. 719).

Donna Hutchins testified that she remembered Petitioner saying that he would have no problem shooting someone in the back if they were on his property; that he believed that the hunters were on his property; and that they got what they deserved.  (Tr. 751-753).  According to Hutchins, she confronted Petitioner and said "you did this," to which replied, smirking, "probably." (Tr. 754).

In addition to his statements regarding the circumstances surround the subject homicides, Petitioner also made several statements about trespassing and poaching that are particularly telling.  Marcia Alcock testified that Petitioner told her in 1994 that he would skin poachers alive and pour salt in their wounds.  (Tr. 774).  Guy Cherry testified that in 1991 Petitioner told him that he confiscated hunters' guns he caught on his property and if someone were to give him any trouble about it, he would blow that person away.  (Tr. 781-82) ("People come on my property I just blow them away; that's how I deal with them.").

The substantial testimonial evidence and the physical evidence surrounding the homicides—and the reasonable inferences drawn from it[4]—were sufficient to establish the elements of premeditation and deliberation for first-degree murder.

### 2.    Reasonableness of Michigan Appellate Court

----

[4] "A conviction may be sustained based upon nothing more than circumstantial evidence."  Saxton, 547 F.3d at 606.  In *Saxton*, the Sixth Circuit denied a petition for writ of habeas corpus based on a sufficiency-of-the-evidence issues, relating to a state murder conviction where "there was no testimonial or physical evidence that placed [the petitioner] at the scene of the crime."

The Michigan Court of Appeals, the last court to issue a reasoned decision in this case, stated

in pertinent part:

> Defendant also argues that the trial court committed error requiring reversal when it denied defendant's motion for directed verdict of acquittal brought pursuant to MCR 6.419(A). Specifically, defendant argues that there was insufficient evidence in the record from which premeditation could be inferred. We disagree.
>
> This Court reviews the trial court's decision on a motion for directed verdict de novo to determine whether, when viewed in the light most favorable to the prosecutor, a rational trier of fact could find that the evidence proves the essential elements of the crimes beyond a reasonable doubt. *People v. Kris Aldrich*, 246 Mich.App 101, 122-123; 631 NW2d 67 (2001). "Premeditation may be established through evidence of the following factors: (1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide." *People v. Anderson*, 209 Mich.App 527, 537; 531 NW2d 780 (1995) (citation omitted). Premeditation and deliberation may be inferred from the circumstances surrounding a homicide. *People v. Ortiz*, 249 Mich.App 297, 301; 642 NW2d 417 (2002). Minimal circumstantial evidence is sufficient. *Id.* Premeditation requires time to allow a defendant to take a second look. *People v. Kelly*, 231 Mich.App 627, 642; 588 NW2d 480 (1998). "A sufficient time lapse to provide an opportunity for a 'second look' may be merely seconds . . . dependent on the totality of the circumstances surrounding the killing[.]" *People v. Meier*, 47 Mich.App 179, 191-192; 209 NW2d 311 (1973).
>
> The trial court noted that the hunters were each shot through the back, through their hunting licenses, and that this indicated that the murders were committed consistent with an "execution-style killing." The evidence supports the trial court's assessment. Because the victims were shot in the back, it could reasonably be inferred that they had been fleeing when shot, that they had been held at bay when shot, or that defendant surprised and shot them before they could turn around and react. Each of these scenarios support a finding that the shootings were premeditated, in that they gave defendant time to take a second look. Further, as noted above, many witnesses testified that defendant hated hunters and "poachers," he had threatened other hunters on several occasions, and defendant insinuated that he had committed the murders and

> viewed the murders with approbation. Defendant also took the gun of
> one of the hunters, cleaned it, and then returned it to the crime scene
> for law enforcement to find. Taking these circumstances into account,
> especially when considered in the context that the victims were shot
> in the back, there was sufficient circumstantial evidence to support
> a finding of premeditation. Accordingly, the trial court did not err in
> denying the motion for directed verdict.

*Titus*, No. 243642, 2004 WL 316427, slip op. at 4.

This decision evidences a thorough examination of the facts, which support the jury's conviction for first degree murder. The state court's decision satisfies the test set forth in *Jackson v. Virginia, supra*.

In summary, there was sufficient evidence presented for a rational trier of fact to conclude beyond a reasonable doubt that Petitioner actually killed or participated in the premeditated killing of the victims. The Court concludes that a reasonable jury could convict Petitioner and that the Michigan Court of Appeals' decision was not an unreasonable application of the law as determined in *Jackson*. Accordingly, habeas relief is not warranted on this claim.

### C.      Ineffective Assistance of Counsel Claim

Petitioner also asserts that the Court should conduct an evidentiary hearing, or remand this case to the trial court for an evidentiary hearing, on whether defense counsel was ineffective because he failed to introduce evidence of Charles Lamp's admitted involvement in a similar homicide ("Van Buren County homicide"). Although Petitioner fully and fairly presented the ineffective assistance of counsel to the Michigan Court of Appeals during his appeal, Petitioner has not presented evidence that demonstrates that his defense counsel was ineffective for failing to introduce evidence of Lamp's admitted involvement in a similar murder. Therefore, Petitioner's second prayer for relief is also denied.

### 1.  Exhaustion of State Remedies

The doctrine of exhaustion of state remedies requires state prisoners to "fairly present" their claims as federal constitutional issues in the state courts before raising those claims in a federal habeas corpus petition.  *See* 28 U.S.C. § 2254(b)(1)(A) and (c); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). The exhaustion requirement is satisfied if a prisoner invokes one complete round of the state's established appellate review process, including a petition for discretionary review to a state supreme court. *O'Sullivan*, 526 U.S. at 845. A petitioner "'fairly presents' h[is] claims to the state courts by citing a provision of the Constitution, federal decisions using constitutional analysis, or state decisions employing constitutional analysis in similar fact patterns." *Levine v. Torvik*, 986 F.2d 1506, 1516 (6th Cir. 1993); *see also Prather v. Rees*, 822 F.2d 1418, 1420 (holding that "[o]rdinarily, the state courts must have had the opportunity to pass on defendant's claims of constitutional violations"). A Michigan prisoner must present each ground to both Michigan appellate courts before seeking federal habeas corpus relief.  *See Mohn v. Bock*, 208 F. Supp. 2d 796, 800 (E.D. Mich. 2002). The petitioner bears the burden of showing that state-court remedies have been exhausted. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).

In this case, Petitioner first raised his ineffective assistance claim in his motion to remand filed in the Michigan Court of Appeals.  The court of appeals denied the motion "because the [c]ourt [was] not persuaded that a remand was necessary at th[at] time."  Petitioner does not provide, and the Court cannot find, any indication that Petitioner included the ineffective assistance of counsel claim in his brief on appeal, and the Michigan Court of Appeals did not address that claim in its opinion affirming Petitioners' conviction.  Petition then sought rehearing from the Michigan Court

of Appeals, but it was denied.   Petitioner then sought leave to appeal in the Michigan Supreme Court.   This time, Petitioner included the ineffective assistance of counsel in his brief.   Stating that it was "not persuaded that the questions presented should be reviewed by this [c]ourt," the Michigan Supreme Court denied Petitioners' application for leave to appeal.   Thus, the issue becomes whether Petitioner properly presented his claim to both the Michigan Court of Appeals and the Michigan Supreme Court.

The Sixth Circuit has held that raising a ineffective assistance of counsel claim in a properly filed motion to remand with the Michigan Court of Appeals is sufficient to present a claim to the Michigan Court of Appeals for the purpose of exhausting a claim for federal habeas review. *See Elmore v. Foltz*, 768 F.2d 773, 775 (6th Cir. 1985).

Respondent seeks to distinguish *Elmore* in two respects.  First, Respondent argues that unlike in *Elmore*, where the Michigan Court of Appeals denied the motion for remand "for lack of merit on the grounds presented," the Michigan Court of Appeals denied the motion in the instant case because it was "not persuaded that a remand was necessary at this time."  According to Respondent, the Michigan Court of Appeals' order in *Elmore* showed that the ineffective assistance of counsel claim was effectively denied on the merits.  This Court, however, fails to see why the difference between the language used in *Elmore* and that used in the instant action necessitates a different conclusion.  Although the Michigan Court of Appeals in this case did not specifically state that its order was based on the merits, it did deny the motion and state that it was not persuaded that a remand was necessary.   Given that it is undisputed that Petitioner's motion to remand was procedurally correct, the court of appeals must have at least addressed the merits in making its decision to deny the motion.  In fact, just like the modifier "at this time" in the present case, the

modifier "on the grounds presented" seems to indicate that the Michigan Court of Appeals may have reached a different conclusion if different grounds were later presented to it.

Respondent also contends that since *Elmore* was decided before the U.S. Supreme Court's decision in *Castille v. Peoples*, 489 U.S. 346 (1989), which held that a presentation of a claim to only  the state supreme court does not suffice to satisfy the exhaustion requirement, part of the *Elmore* court's holding is no longer good law.  Specifically, Respondent questions the continued validity of the Sixth Circuit's determination that the petitioner's presentation of his claims to the Michigan Supreme Court satisfied the exhaustion requirement.  This Court, however, does not read *Elmore* as holding as such.  Rather, the *Elmore* court's finding that the petitioner exhausted his remedies included not only his presentation to the Michigan Court of Appeals vis-a-vis the motion to remand but also the submission of his letter to the Michigan Supreme Court asking it to review his case.  Thus, the presentation of the issue to the Michigan Supreme Court was merely the completion of his exhaustion requirement; it was not a wholly separate means of satisfying the exhaustion requirement, as Respondent would like this Court to believe.

In the instant case, Petitioner presented the issue to the Michigan Court of Appeals through his Motion to Remand.  He then presented the same issue to the Michigan Supreme Court as part of his direct appeal.   By raising his ineffective assistance of counsel claim in his motion to remand and then in his direct appeal to the Michigan Supreme Court, Petitioner properly presented the claim to the Michigan courts as part of the direct review process.

## 2.    Merits of Ineffective Assistance Claim

To prevail on his ineffective assistance of counsel claims, petitioner must show that the state court's conclusion regarding these claims was contrary to, or an unreasonable application of,

37

*Strickland v. Washington*, 466 U.S. 668 (1984). *See Cathron v. Jones*, 190 F. Supp. 2d 990, 996 (E.D. Mich. 2002). *Strickland* established a two-prong test for claims of ineffective assistance of counsel: the petitioner must show (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. "With regard to the performance prong of the inquiry, . . . judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from the counsel's perspective at that time.'" *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000) (quoting *Strickland*, 466 U.S. at 689). In making this evaluation, this Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *See id*. at 689.

Petitioner argues that his defense counsel rendered him ineffective assistance of counsel when they failed to discover and present the circumstances of Lamp's involvement in the separate Van Buren County homicide case to Petitioner's jury. Petitioner asserts that evidence could have been presented to the jury under MRE 404(b), as evidence of Lamp's scheme, intent, and to identify the person who actually committed the homicides in question. This could have been accomplished either through the direct examination of Lamp as to his admissions in the other case, or, if Lamp refused to testify, through the testimony of Guy Simpson, who also testified in the Van Buren County homicide trial under a grant of immunity.

Petitioner asks the Court to hold an evidentiary hearing—or conditionally grant the writ of habeas corpus pending a hearing by the state court pursuant to *People v. Ginther*, 390 Mich. 436

38

(1973)—to make a record of the circumstances of Lamp's involvement in the other homicide,  to

question defense counsel as to whether they discovered those circumstances, and if so, why they did

not present this evidence to the jury.

First, it is important to note that Petitioner did not offer his own affidavit, or an affidavit from

Lamp, Blackston, or Petitioner's two trial attorneys, showing any proposed new evidence supports

his request for a hearing.  Regardless, on the current record, it is clear that defense counsel was

aware of the circumstances of Lamp's involvement in the separate Van Buren County homicide.

The trial transcript clearly shows that Petitioner was aware of the circumstances of Lamp's

involvement in the other homicide.  (Tr. 577-79).   In fact, defense counsel informed the court,

outside of the presence of the jury, that they sent an investigator to visit with Blackston after

learning that he was told by Lamp that he committed the subject murders.  (Tr. 577).  The

investigator then administered a polygraph to Blackston, which he passed.  Defense counsel then

informed the court that they sent the same investigator to talk to "Lamp, who is in prison in the

thumb area *for the same homicide with [] Blackston*," that Lamp openly talked to the investigator

and to police, and that two polygraphs were administered on Lamp: one inconclusive and the other,

involving different questions, he passed.  (Tr. 577) (emphasis added).  The trial transcript also

clearly shows that the defense counsel considered subpoenaing Lamp to testify in the matter but

chose not to do so because they believed that Lamp was not an "unavailable witness" and therefore

the statement by Blackston that Lamp told him that he committed the subject murders would not be

admissible, and that Lamp, if called to testify, would simply deny being involved in the subject

murders, just as it did during his examination by the investigator.  After listening to the defense

counsel's recitation of the circumstances, the trial judge stated that, without making a ruling, under

39

those circumstances, it would appear that subpoenaing Lamp "would be generally a useless act." (Tr. 580).

In the alternative, Petitioner contends that while defense counsel may have been aware of the Lamp's involvement in a similar murder, they were deficient for not bringing this evidence to the jury's attention.  Petitioner argues that had the jury been aware of Lamp's involvement in a killing under comparable circumstances, they would have had the reasonable doubt necessary to acquit Petitioner.  Petitioner explains that defense counsel could have and should have elicited this evidence from Lamp under MRE 404(b).

Assuming that MRE 404(b) can be utilized by the parties to bring in prior relevant bad acts of witnesses,[5] Petitioner has failed to demonstrate that defense counsel was deficient in not soliciting testimony from Lamp or from other individuals, who may have had knowledge of the similar homicide.

First, it is unclear, at best, whether the evidence would have been relevant.  Defense counsel had minimal evidence, at best, that would tie Lamp to Petitioner's murder trial.  Helen Nofz, one of Petitioner's neighbors, testified that she noticed a man with his car stuck in the ditch on the day of the subject homicides.  (Tr. 990).   When the police initially questioned her shortly after the homicides, she described the man as wearing glasses and driving a hatchback.  (Tr. 991-992).  She

_____

[5]  The Michigan cases interpreting MRE 404(b) cited by Petitioner involve the effect of the rule on defendants, not witnesses.  Several federal courts, in addressing FRE 404(b), the rule upon which MRE 404(b) is modeled, however, have found that it pertains to witnesses as well. *See, e.g.*, *United States v. Skelton*, 514 F.3d 433 (5th Cir. 2008).   Such as finding would also appear to apply in Michigan, as the Michigan rule, like the federal rule, states that "[e]vidence of a *person's* character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except . . . ."

40

said that the man appeared agitated and did not want her to call the police. (Tr. 990). When the investigator later showed her a series of only four pictures, one of which was of Lamp, she informed that the investigator that the picture of Lamp looked like the man but that she could not be sure since twelve years had passed. (Tr. 999). The prosecution presented Lamp's mother and ex-wife as rebuttal witnesses. They testified that Lamp never deer hunted, was a smaller person than the man Nofz described, drove a Ford Mustang—not the vehicle Nofz described, and that he never wore glasses. (Tr. 1083-84).

Second, and more importantly, there would have been a calculated risk of putting Lamp on the witness stand. If he were called to testify, he not only could have denied any involvement in the subject murders but also denied being the man in the ditch. In addition, he may not have looked much if anything like the man Nofz described. Finally, if his involvement in the similar murders were brought to bear, Lamp would have had an opportunity to explain that he was not the killer in the Van Buren County homicide case and that Blackston had a motive to frame Lamp in this case because he testified against Blackston in that case.

In reviewing the trial transcript, this Court cannot find that Petitioner's defense counsel was in any way deficient. The transcript reveals that defense counsel clearly knew about the circumstances of the Van Buren County homicide, that they thoroughly investigated Blackston and Lamp, and that there were legal and logical obstacles in submitting evidence about Lamp in Petitioner's defense. Therefore, the Court finds that Petitioner has not met his burden of overcoming the presumption that defense counsel's decision not to attempt to present evidence of the Van Buren County homicides was sound trial strategy.

**III.    CONCLUSION**

41

For the reasons stated above, this Court concludes that Petitioner is not entitled to federal habeas relief on his insufficient evidence claim or his ineffective assistance of counsel claim. Accordingly, Petitioner's writ of habeas corpus is **DENIED**.

The Court will grant a certificate of appealability on the sufficiency of the evidence claim. The Court, however, will not grant a certificate of appealability on the second claim, ineffective assistance of counsel.

In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84, (2000). Accordingly, the Court issues a certificate of appealability because reasonable jurists could find the Court's assessment of Petitioner's sufficiency of the evidence claim debatable or wrong. The Court declines to issue a certificate of appealability on Petitioner's second claim, ineffective assistance of counsel, because reasonable jurists could not find the Court's assessment of that claim debatable or wrong.

S/Paul D. Borman_____
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  June 24, 2009

42

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on June 24, 2009.

S/Denise Goodine
Case Manager